Filed 11/19/15  P. v. Lopez CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>GEORGE LUIS LOPEZ,<br><br>     Defendant and Appellant. | F067545<br><br>(Tulare Super. Ct. No. VCF266448)<br><br>**OPINION** |

THE COURT*

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jamie A. Scheidegger, Deputy Attorneys General for Plaintiff and Respondent.

-ooOoo-

---

* Before Poochigian, Acting P.J., Detjen, J. and Franson, J.

George Luis Lopez (Lopez) was convicted of three counts of committing a lewd and lascivious act against a child under the age of 14.  Two of the counts were found to violate Penal Code section 288, subdivision (b)(1),[1] and one count was found to violate section 288, subdivision (a).  Because of enhancements, Lopez was sentenced to a term of 15 years to life in prison.

Lopez argues he received ineffective assistance of counsel for two separate reasons.  We find no merit to these claims and affirm the judgment.  We agree with the parties, however, that the abstract of judgment must be corrected, and will order the trial court to prepare an abstract of judgment that is consistent with the oral pronouncement of judgment.

## FACTUAL AND PROCEDURAL SUMMARY

### *The Information*

The information charged Lopez with eight counts of violating section 288, subdivision (b)(1), committing a lewd or lascivious act on a child under the age of 14 through the use of force or fear.  The victim in each count was T.Y.  The ninth count of the information charged Lopez with violating section 288, subdivision (a), committing a lewd or lascivious act on a child under the age of 14.  The victim in this count was J.M. Each count alleged Lopez was subject to a sentence of 15 years to life pursuant to section 667.61, subdivision (b) because the alleged crime is listed in subdivision (c)(4) of section 667.61 and because there were multiple victims as specified in subdivision (e)(4) of section 667.61.  Counts four, five, six, eight and nine also alleged Lopez was statutorily ineligible for probation because there was substantial sexual conduct pursuant to the provisions of section 1203.066, subdivision (a)(8).

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

2.

*Trial Testimony*

The testimony of the complaining witnesses was presented in three parts—police interview, child abuse response team (CART) interview, and trial testimony.

*T.Y.'s Testimony*

### Interview with Officer Joshua Peña

Officer Joshua Peña interviewed T.Y. at her elementary school shortly after her parents reported the molestation. T.Y. appeared calm during the interview, and she was able to distinguish between the truth and a lie. T.Y. told Peña that Lopez had touched her inappropriately the previous day. T.Y. explained that Lopez had picked her up, along with his daughter, from school and had taken them home. Mrs. Lopez came home at some point. Around 5:00 p.m. Mrs. Lopez and her daughter left the house, leaving T.Y. and Lopez at the home. T.Y. was watching television when Lopez joined her on the couch. T.Y. went to the bathroom. When she returned, Lopez maneuvered himself so that T.Y. ended up sitting on his lap. He then placed his hand under her shirt and bra, touching her breasts. T.Y. told Lopez she wanted to go outside to play, but he made excuses as to why she could not do so. T.Y. could not leave because Lopez had his arm around her waist. After approximately 10 to 15 minutes, Lopez let T.Y. go and she ran to the bathroom. When she returned to the living room, T.Y. sat on the couch. Somehow T.Y. again ended up sitting on Lopez's lap. This time Lopez placed his hand inside T.Y.'s pants, outside of her underwear. Lopez rubbed T.Y.'s private area. T.Y. asked Lopez to stop on three different occasions. Lopez let T.Y. go when her mother arrived.

During the interview, T.Y. said similar incidents had occurred on approximately two previous occasions, but she could not describe those incidents. T.Y. told Peña she did not report the contact sooner because Lopez was a long-time family friend.

### CART Interview

T.Y.'s CART interview occurred on February 1, 2006 (exh. 12A). T.Y. was 10 years old at the time of the interview. The interviewer confirmed that T.Y. knew what

3.

the truth was and told her it was important to tell the truth during the interview. T.Y. then explained what occurred on January 30, 2006. T.Y. stated she was friends with Lopez's daughter, M. Lopez had picked the girls up from school. Later that afternoon M. left for basketball practice with her mother. T.Y. was watching a movie when Lopez sat down with her.

T.Y. went to the bathroom. When she returned, she accidentally sat on Lopez's lap. Lopez put his hand up T.Y.'s shirt and felt her breast area. Lopez had one hand around T.Y.'s waist, so her efforts to get away initially were unsuccessful. T.Y. asked Lopez to stop several times. T.Y. finally got away and returned to the bathroom, where she stayed for five to 10 minutes.

When T.Y. returned she ended up on Lopez's lap again, although she was not sure how that occurred. This time Lopez put his hands down T.Y.'s pants for about five to 10 minutes. Lopez's hand was on top of T.Y.'s underwear. T.Y. was unsure what part of her anatomy Lopez was touching. T.Y.'s mother picked her up a short while later.

When asked whether this was the only time such an incident had occurred, T.Y. said similar incidents had occurred around four times before, although she could not provide any details of those other incidents, including when they had occurred or where Lopez had touched her. T.Y. did recall that after the first incident, Lopez told her to not tell anyone, which was why she kept quiet until she told her mother about the molestations the morning after the last incident. She believed three other incidents occurred when she was nine years old. T.Y. told her parents because she did not want to have to go through another incident.

### Interview with Detective Chris Jennings

T.Y.'s interview with Detective Chris Jennings occurred on October 27, 2011 (exh. 1A), which was five years after the initial report of the molestation. T.Y. explained that she would go to Lopez's house after school while her parents worked. She also

explained that M. participated in various activities, and M.'s mother would take M., leaving T.Y. with Lopez until her mother picked her up.

The first incident recalled by T.Y. occurred when she was in the fourth grade. T.Y. enjoyed talking and wrestling with Lopez. The first incident occurred when T.Y. ended up on the floor as they were wrestling and her pants came unbuttoned. Lopez pulled her pants down and her shirt up, exposing T.Y., but he did not touch her. Lopez told T.Y. to not tell her parents and then gave her a chocolate bar as a bribe.

T.Y. could not recall any details of the other incidents that had occurred, except for the last incident, but told Jennings that the molestation happened repeatedly. The last incident occurred when T.Y. was sitting on the couch in Lopez's house. T.Y. was in the fifth grade. The incident occurred on the day before T.Y. reported the molestation. Lopez was watching television when T.Y. entered the room. Lopez told T.Y. to sit on his lap. Lopez put his hands underneath T.Y.'s shirt and touched her breast area. T.Y. went to the bathroom, where she stayed for a while. Eventually, T.Y. went back into the living room and again sat on Lopez's lap because she feared "repercussions" if she did not do so. Lopez placed one hand on T.Y.'s shirt and the other hand on her stomach. Lopez moved one hand down T.Y.'s pants near her vagina.

As she conversed with Jennings, T.Y. recalled an incident where she spent the night with M. During the night she woke up to find Lopez with his hand up her shirt.

T.Y. estimated Lopez had molested her approximately twice a week for two years. T.Y. would try to get away, but Lopez would hold onto her. T.Y. also would tell Lopez to stop, but without success. After the molestations, Lopez would give her candy. Defense counsel noted the transcript of the interview was inaccurate in several places.

### Trial Testimony

T.Y. was 17 at the time she testified at trial. She had met Lopez through his daughter, M. T.Y. and M. were best friends through the fifth grade. While in grade school, T.Y.'s mother usually dropped her off at school and Lopez would pick her up and

either take her to his house with M. or take her to her grandmother's house. Usually the girls did homework or watched television after school. T.Y.'s mother would pick her up on her way home from work.

Lopez first touched T.Y. inappropriately when she was in the third grade. M. had gone somewhere with her mother. Lopez was playing with T.Y. when her pants accidentally came unbuttoned. When T.Y. went to button them, Lopez said, "Don't." Lopez then pulled down her pants and underwear and pulled her shirt up. After a short time he pulled the shirt down and the pants up and apologized to her. He did not touch her that time. Lopez told T.Y. to not tell her parents and then bribed her with a candy bar.

Another incident occurred while T.Y. was doing homework on M.'s bed. T.Y. thought she was probably in the fourth grade. While T.Y. was doing her homework, Lopez came into the room and lay on the bed with her. He was talking to T.Y. about how someday someone would kiss her. When Lopez got up to leave the room, he kissed T.Y. on the lips.

Another instance occurred when T.Y. spent the night with M. The two were asleep in M.'s bed. T.Y. woke up to find Lopez with his hand up her shirt. T.Y. pretended to be asleep, and Lopez soon left. This occurred when T.Y. was approximately nine or 10, the same age as the previous incident.

The last incident occurred when T.Y. was in the fifth grade. Lopez picked up T.Y. and M. after school. M. and her mother then left for an activity. T.Y. initially was doing homework. When she came into the living room, she had a feeling Lopez would touch her, so she went into the bathroom and hid, hoping her mother would arrive to take her home. When she came out, Lopez told T.Y. to sit on his lap. T.Y. complied. Lopez put one hand up T.Y.'s shirt and touched her breast and one hand down her pants and touched her vagina. T.Y. was able to get away when Lopez allowed her to go play with the dog. The next morning T.Y. told her mother about the incident.

6.

While T.Y. was not able to recall any other specific incidents where Lopez had touched her inappropriately, she did recall he had done so on a regular basis from approximately the third grade onward. T.Y. testified she believed Lopez had touched her vagina more than five times during this period.

T.Y. did not tell her parents before the last incident because Lopez told her to not do so, and she was afraid of being judged or blamed for the incidents.

*J.M.'s Testimony*

**Police Interview**

The prosecutor played to the jury the statement J.M. gave to police officers on September 25, 2011 (exh. 15A). In this statement the officer first confirmed that J.M. knew the difference between the truth and a lie. The officer next asked J.M. if there were areas where she should not be touched. J.M. indicated she should not be touched on her vaginal area or on her buttocks, although it was difficult to be sure from the transcript of the interview.

The officer asked J.M. what she would do when she visited her aunt. She said she would play with Lopez's daughter, M. J.M. initially denied playing with a computer and denied Lopez had done anything to make her feel bad. J.M. also indicated that no one had touched her in places she should not have been touched. J.M. stated she was not afraid of her aunt and uncle. The following colloquy then occurred.

"OFFICER: I was … talking to your mom and your mom said that … you told her that someone touched you in your foof.[2]

"[J.M.]: It was nino George.

"OFFICER: It was nino George? Yeah? Okay. Why did he touch you there?

"[J.M.]: I don't know.

---

[2] "Foof" is the word used by J.M. to describe her vagina.

7.

"OFFICER:  You don't know?  Did he touch you when he had your—your [underwear] on?  Or did he touch you underneath your [underwear]?

"[J.M.]:        He touched me and I had my [underwear].

"OFFICER:  On?  Okay.  Did—what—what did he tell you when he did that?

"[J.M.]:        Nothing."

J.M. then explained that she was with Lopez in "the room" playing games on Lopez's computer.  M. was in her room, and J.M.'s mother and two aunts were in the kitchen cooking.  This was the only time Lopez touched her vagina.

### CART Interview

J.M.'s CART interview also was played for the jury (exh. 2A).  In the relevant portions of this interview, J.M. confirmed she was four years old and had five sisters.  She described her family, including the family pets.  J.M. initially denied anything had happened to her that she wanted to talk about.  When asked if anyone had hurt her or had done anything to her, she stated that the kids at school hit her occasionally.

The interviewer then directed the conversation to good and bad touches.  J.M. knew the difference between good touches (hugs and kisses) and bad touches (being hit or pinched).  J.M. denied knowing about "secret touches"—where someone would touch J.M. where they were not supposed to and then tell J.M. to keep it a secret.  The following colloquy then occurred:

"[INTERVIEWER]:  No?  Um, have you—has anyone ever touched you where they're not supposed to?

"[J.M.]:              (Inaudible).

"INTERVIEWER]:  Is that a yes or a no?

"[J.M.]:              Mm-hmm.

"[INTERVIEWER]:  Mm-hmm?  Okay.  Well, who's touched you where they're not supposed to?

8.

"[J.M.]:            Um, um, right here.

"INTERVIEWER]: Right there?

"[J.M.]:            Mm-hmm.

"INTERVIEWER]: Okay. Well, did you know that we all have private places?

"[J.M.]:            Mm-hmm.

"[INTERVIEWER]:  And private parts on our body that other people aren't supposed to touch?  Did you know that?

"[J.M.]:            Uhn-uhn."

The interviewer next produced a diagram of a girl and had J.M. identify the various body parts.  The interviewer asked J.M. if anyone had touched her on certain parts of her body (eyes, mouth, and belly button) and then asked:

"[INTERVIEWER]:  No?  What about on your foof?  Has anybody tried to touch you on your foof?

"[J.M.]:            Uhn-uhn.

"[INTERVIEWER]:  Has anybody ever asked if they could touch your foof or tried or—or …

"[J.M.]:            The police told me that's not where you touch people.

"[INTERVIEWER]:  The police told you that?

"[J.M.]:            Mm-hmm.

"[INTERVIEWER]:  How—why did you talk to the police?

"[J.M.]:            Um, 'cause (inaudible) person touched that and the butt.

"[INTERVIEWER]:  One person touched that and the butt?

"[J.M.]:            No.  Somebody—Uncle Nino, he touches me on the foof.

"[INTERVIEWER]:  Your Uncle Nino touches you on the—on the foo-foos?

9.

"[J.M.]:                    Mm-hmm.

"[INTERVIEWER]:   So he did it one time or more than one time?

"[J.M.]:                    One time.

"[INTERVIEWER]:   One time?  Can you tell me exactly what he did when that happened?

"[J.M.]:          We were playing a Barbie Girl game on his computer and he touches me when I need help on my foofies.

"[INTERVIEWER]:   Okay.  So were you on the computer?  Were you sitting at the computer when he touched you on your foof?

"[J.M.]:                    Mm-hmm.

"[INTERVIEWER]:   Okay.  Was there anybody else with you?

"[J.M.]:                    Um, no.  Just Nino.

"[INTERVIEWER]:   Just Nino?

"[J.M.]:                    Mm-hmm.

"[INTERVIEWER]:   Were you at his house on his computer?

"[J.M.]:                    Mm-hmm.

"[INTERVIEWER]:   Or somewhere else?

"[J.M.]:                    At Nino's house.

"[INTERVIEWER]:   And you said you needed help on it?

"[J.M.]:                    Mm-hmm.

"[INTERVIEWER]:   And what did you need help with?

"[J.M.]:          I tried to put tried to make with the computer stuff and (inaudible) cookies.

"[INTERVIEWER]:   Okay.  So … did you ask Nino for help?

"[J.M.]:                    Mm-hmm.

"[INTERVIEWER]:   What did you say when you asked him for help?  What did you tell him?

10.

"[J.M.]:        I get off the chair and I get to go get Nino and he was coming with me and then he tried to stop it but I can't.  And so—

"[INTERVIEWER]:  He—you tried to stop him but you can't?

"[J.M.]:        Uhn-uhn.  (Inaudible) said stop.

"[INTERVIEWER]:  What—what were you trying to stop?

"[J.M.]:        Him touching my foof.

"[INTERVIEWER]:  How did he touch it?

"[J.M.]:        Um, right there.

"[INTERVIEWER]:  What did he touch it with?

"[J.M.]:        His, um, hand.

"[INTERVIEWER]:  His hand?

"[J.M.]:        Mm-hmm.

"[INTERVIEWER]:  Did his hand stay on top of your clothes like this?  Or did it go inside, underneath?

"[J.M.]:        Inside.

"[INTERVIEWER]:  Inside?

"[J.M.]:        Mm-hmm.

"[INTERVIEWER]:  What were you wearing when he touched your foof? Do you remember what clothes you had on?

"[J.M.]:        I had, um, (inaudible) shirt and shorts.

"[INTERVIEWER]:  And shorts?

"[J.M.]:        Mm-hmm.

"[INTERVIEWER]:  Did you have anything on underneath your shorts?

"[J.M.]:        Um, [underwear].

"[INTERVIEWER]:  [Underwear]?

"[J.M.]:        Mm-hmm.

"[INTERVIEWER]:  So when Nino touched your foof did he touch you on your [underwear]?

"[J.M.]:        No.

11.

"[INTERVIEWER]: Or did he touch you on your skin?

"[J.M.]: Inside my [underwear].

"[INTERVIEWER]: Inside your [underwear]?

"[J.M.]: Mm-hmm.

"[INTERVIEWER]: What did that feel like when he touched your foof? What did it feel like to your foof?

"[J.M.]: I don't know.

"[INTERVIEWER]: Um, when he had his hand on your foof did he move his hand around or did he just keep it still?

"[J.M.]: Just kept it still and he took it out.

"[INTERVIEWER]: Did he say anything when he—when he touched your foof?

"[J.M.]: I was going to ask him something and (inaudible) but he won't.

"[INTERVIEWER]: Did you say anything to him when he touched your foof?

"[J.M.]: Mm-hmm.

"[INTERVIEWER]: What'd you say?

"[J.M.]: Um, I said stop.

"[INTERVIEWER]: Did he stop when you told him to stop?

"[J.M.]: Uhn-uhn.

"[INTERVIEWER]: Did he say anything back to you?

"[J.M.]: Hmm—

"[INTERVIEWER]: Did he answer you?

"[J.M.]: He answered me but, um, he was trying to look on the computer for a different game.

"[INTERVIEWER]: How did he answer you?

"[J.M.]: Um, he didn't answer me.

"[INTERVIEWER]: Okay. Has—has he ever done that before?

12.

"[J.M.]:                    (Inaudible.)

"[INTERVIEWER]:  Or was that the only time?

"[J.M.]:                    That was the only time."

The interview continued for a short while confirming the above constituted the relevant facts. The interviewer also confirmed J.M.'s account by asking, "You said earlier that he touched your foof and your butt. Is that right or did I get that wrong?" J.M. replied, "No, you get it wrong. He only touched my foofie." When the interviewer asked when the incident occurred, J.M. replied, "Um, yesterday. He touched my foofies."[3] J.M. also stated she was currently four years old and that the incident occurred when she was three. The interviewer confirmed that J.M. knew the difference between the truth and a lie, but she did not ask J.M. if she had been truthful throughout the interview.

### Trial Testimony

J.M. testified. She could not identify Lopez. She denied anyone had touched her vagina and denied telling her mother or a police officer that someone had done so.

### Law Enforcement Testimony

Peña interviewed Lopez after he interviewed T.Y. Lopez denied anything inappropriate occurred with T.Y.

Jennings interviewed Lopez regarding the allegations made by J.M. Lopez admitted that J.M. came to his house regularly, and he played with her when she was there. He also admitted that J.M. played on his computer, and he assisted her at times. He denied that J.M. ever sat on his lap while playing on the computer and denied ever having inappropriate contact with J.M. Lopez suggested the whole incident may have been a "misunderstanding or a family issue."

---

[3] The incident occurred several days before, so clearly J.M. was mistaken on the date of the incident.

Jennings testified that during the CART interview, J.M. could distinguish between the truth and a lie, but she never was instructed to tell the truth during the interview. J.M. was not asked (1) if a lie was bad, (2) if she would be punished if she told a lie, (3) if she would not be punished if she told the truth, (4) if she would get into trouble if she lied, or (5) if her mother had told her to tell the truth.

Lopez's computer was seized and searched, but nothing of evidentiary value was found on it.

### Witness Testimony

Michelle M. testified she is Lopez's niece. J.M. is her younger sister. She confirmed that Lopez would pick her up from school, along with M. and T.Y. She also confirmed that Lopez's wife, Delores, would take her and M. to dance and volleyball classes and T.Y. would stay at the Lopez home with Lopez.

Michelle also recalled a day when her parents were very upset and an officer came to their house. Michelle asked what had happened, and her father told her that Lopez had touched J.M. Michelle asked J.M. what had happened. J.M. stated she had been sitting on Lopez's lap while playing on the computer and Lopez touched her vagina inside of her shorts.

M.R. is J.M. and Michelle's mother. Lopez's wife is M.R.'s aunt. M.R. related that in 2011 J.M. told her that Lopez had touched her inappropriately. J.M. was four at the time. M.R. was working on her computer when J.M. came into the room. The two began talking and J.M. asked M.R. why she had given her a hug. M.R. explained about good and bad touches and told J.M. that no one should ever touch her "privates." That was when J.M. said that Lopez had done so when J.M. was playing on the computer. J.M. said she was sitting on Lopez's lap when Lopez touched her vagina inside of her shorts. M.R. then called the police and reported the incident.

M.R. heard about the allegations made by T.Y. against Lopez in 2006 when the police interviewed Michelle. M.R. was told by either Lopez or his wife that the

14.

allegations were the result of a misunderstanding. Since Lopez was not prosecuted at the time, M.R. believed the allegation was a misunderstanding.

M.R. also admitted Lopez had loaned her money in the past, but claimed she did not have any issues with Lopez before she learned of J.M.'s allegation.

T.Y.'s mother explained that her family had become friends with Lopez's family because their daughters became school friends beginning in kindergarten. Eventually, T.Y.'s mother began taking both girls to school in the mornings, and Lopez would pick them up from school in the afternoons. Lopez would then babysit until T.Y.'s mother ended her work day, usually between 5:30 and 5:45 p.m. This arrangement continued until T.Y. told her mother she was being molested by Lopez.

On the morning of January 31, 2006, T.Y.'s mother was lying in bed when T.Y. came into the room and asked if she (T.Y.'s mother) had ever been verbally, physically, or sexually abused. Mother became concerned and T.Y. explained that she had been molested by Lopez. Mother did not ask many questions because she wanted the police to investigate without her interference. Later that morning Lopez dropped off his daughter so T.Y.'s mother could take both girls to school. While at the house, Lopez whispered something to T.Y. that her mother could not hear, which was found to be a bit unusual by T.Y.'s mother. After dropping the girls off at school, T.Y.'s parents went to the police station to report the molestation.

T.Y.'s father testified in a manner similar to T.Y.'s mother's testimony in all relevant areas.

**Defense Evidence**

Kathy Bates testified she had known Lopez for over 30 years, and she had never seen him act inappropriately with a child, and, in her opinion, he would not do so.

Kathy Bates's daughter testified she had known Lopez her entire life, and he had never acted inappropriately around her. She also opined that Lopez would not act inappropriately with children.

15.

Catalina L. a friend of M.'s, testified that Lopez never acted inappropriately with her. Nor, in her opinion, would he ever do so with other children.

Michaella H. lived in the same neighborhood as Lopez in her youth. She first became friends with M. and later the whole family. She testified that Lopez was more of a father to her than her own father, and that she thought the world of him. Lopez never touched her inappropriately, and, in her opinion, he would not touch anyone inappropriately.

Lopez's brother, Freddie Lopez, provided some background information about Lopez. He testified that he had never seen Lopez act inappropriately around children. Nor, in his opinion, would Lopez do so.

Lopez's wife, Delores, denied that during the relevant time periods she ever left the home to run errands. Delores also claimed that she often took T.Y. to T.Y.'s mother's place of work when she (Delores) took M. to her activities. Delores testified that she was always either at home with T.Y. and M. or she would take T.Y. to her mother's place of employment when she took M. to an activity. According to Delores, T.Y. was never at home alone with Lopez. Lopez never asked Delores to leave T.Y. at home with him when she took Marissa to an activity, nor did Lopez ever take T.Y. any place by herself. T.Y. never gave an indication she was uncomfortable at the Lopez house or did not want to be there, nor did T.Y. ever appear to be avoiding Lopez.

Delores claimed that shortly before T.Y. made the accusations, T.Y.'s mother became pregnant with twins, and this upset T.Y.

On the day T.Y. alleged she was molested by Lopez, Delores found M., T.Y., and Lopez at home when she returned from work. M. had basketball practice at 6:00 p.m. Delores left at approximately 6:00 or 6:10 p.m. to take M. to basketball practice, leaving T.Y. with Lopez. This was the only time Delores ever left T.Y. with Lopez.

Delores never saw Lopez act inappropriately with any children. Nor, in her opinion, would he ever do so.

16.

Delores also admitted that J.M. would come to visit at her house on a fairly regular basis. J.M. spent most of the time with M. Lopez never asked to have J.M. brought to the house. Lopez was there at times, and Delores would see Lopez helping J.M. on the computer. However, J.M. never sat on Lopez's lap while he was helping her on the computer.

J.M.'s mother, M.R., asked to borrow money from the Lopezes in early 2011 on at least two occasions. The Lopezes loaned her over $2,000. However, when M.R. asked to borrow over $4,000 in August, Lopez refused to do so. M.R. became upset.

M. testified in a manner consistent with her mother's testimony about J.M.'s visits to the Lopez house. She also testified in a manner consistent with her mother's testimony about T.Y.'s visits to the Lopez house.

M. never saw her father do anything that made her feel uncomfortable around T.Y. or any other child. She never saw T.Y. avoid Lopez, nor did T.Y. say she did not want to come over to her house. M. confirmed that the only time T.Y. was alone with Lopez was on the day of the last alleged incident.

Lopez's sister-in-law, M.R. Nicacio, testified that she had never seen Lopez act inappropriately with children, and, in her opinion, he would never do so.

Sanjeer Dheri is the store manager of a local chain drug store at which T.Y. used to work. T.Y. resigned after an investigation was started into whether she was stealing from the company. T.Y. was purchasing items that were delineated as "register reward" items. Register rewards essentially are a coupon that is received when an item is purchased and the coupon can be used for future purchases. T.Y. would then return the purchased items to another store but retain the coupon, which the company considered stealing. When she was confronted, T.Y. stated she no longer wished to be employed or be a burden to the store and resigned. T.Y. claimed she did not believe what she was doing was wrong.

*Closing Arguments, Verdict, and Sentencing*

The prosecution relied on T.Y.'s testimony to assert Lopez was guilty of each charged crime and enhancement. Defense counsel argued there was insufficient evidence to support any count, noting the inconsistencies between the statements made by T.Y. and J.M. and their trial testimony. Defense counsel also argued that the failure to ask J.M. if she told the truth throughout her recorded interview rendered the interview unreliable.

After several days of deliberations, the jury found Lopez guilty of counts seven, eight, and nine. Counts seven and eight were the last incident perpetrated on T.Y. that occurred on January 30, 2006. Count nine involved the incident involving J.M. In addition to finding Lopez guilty of these charges, the jury found the multiple victim allegation true for each count, and found true that there was substantial sexual conduct related to count eight. The jury could not reach a verdict on the remaining counts, which eventually were dismissed.

The trial court sentenced Lopez to a term of 15 years to life on each count, with the sentences on counts seven and eight imposed concurrently to the sentence on count nine.

## DISCUSSION

### I.     J.M.'s Testimony

Prior to trial, defense counsel objected to J.M.'s trial testimony on the grounds that she was incompetent to testify as a witness pursuant to the provisions of Evidence Code section 701.[4] Defense counsel argued that because of her age, J.M. could not express herself to a jury and she did not understand the duty of a witness to tell the truth. Defense

---

[4] Evidence Code section 701 states: "(a) A person is disqualified to be a witness if he or she is: [¶] (1) In capable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him; or [¶] (2) Incapable of understanding the duty of a witness to tell the truth. [¶] (b) In any proceeding held outside the presence of a jury, the court may reserve challenges to the competency of a witness until the conclusion of the direct examination of that witness."

counsel requested an Evidence Code section 402 hearing for this purpose. As we read the record, defense counsel objected only to J.M.'s testifying at trial.

The trial court denied the request for an evidentiary hearing and denied the motion after hearing J.M.'s testimony. We also note defense counsel did not cross examine J.M., nor did he ask to voir dire J.M. on her qualifications to testify as a witness. Considering her trial testimony provided no incriminating evidence against Lopez, defense counsel likely concluded that any questions he asked would not help the defense and possibly would lead to testimony that would incriminate Lopez. Lopez does not challenge the trial court's ruling on this issue.

Lopez argues, however, defense counsel was ineffective because he failed to object to the introduction of J.M.'s statements to the police and in the CART interview pursuant to the provisions of Evidence Code section 1360.[5] Defense counsel cited this code section in his motion for a new trial, and the prosecutor cited this code section in his motions in limine when arguing that the taped interviews of both T.Y. and J.M. were

---

[5] Evidence Code section 1360 states: "(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply: [¶] (1) The statement is not otherwise admissible by statute or court rule. [¶] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [¶] (3) The child either: [¶] (A) Testifies at the proceedings. [¶] (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child. [¶] (b) A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party the intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings in order to provide the adverse party with a fair opportunity to prepare to meet the statement. [¶] (c) For purposes of this section, 'child abuse' means an act proscribed by Section 273a, 273d, or 288.5 of the Penal Code, or any of the acts described in Section 11165.1 of the Penal Code, and 'child neglect' means any of the acts described in Section 11165.2 of the Penal Code."

admissible. We did not locate any discussion of Evidence Code section 1360 in the reporter's transcript until after the verdict was recorded.

Evidence Code section 1360 is an exception to the hearsay rule and allows, in a criminal prosecution, admission of out-of-court statements of a minor victim describing any act of child abuse performed on him or her (or an attempt to perform such an act on the victim) if (1) the statement is not otherwise admissible by statute or court rule, (2) "[t]he court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability," and (3) either the victim testifies at the trial or is unavailable as a witness and there is evidence to corroborate the victim's statement. (*Id.,* § 1360, subd. (a).) Additional procedural safeguards are included in the statute but are not relevant to Lopez's arguments.

Lopez asserts that had defense counsel objected to the introduction of the statements, the trial court would have concluded there was insufficient indicia of reliability for those statements, and it would not have allowed their introduction into evidence. Lopez also notes that the statements were introduced in the absence of a hearing being held outside the presence of the jury, and counsel was ineffective for failing to ensure this procedural safeguard was followed.

We turn to Evidence Code section 1360. Even though, as Lopez notes, a hearing was not held outside the presence of the jury during which the trial court could hear evidence and determine whether the time, content, and circumstances of the statement provided sufficient indicia of reliability (*id.,* subd. (a)(2)), the record is adequate to resolve this issue.

Furthermore, it appears the trial court concluded J.M.'s out of court statements contained sufficient indicia of reliability when it denied Lopez's motion for judgment pursuant to section 1118.1. When discussing the evidence related to count nine, the trial court explained:

"The most telling part for me, first of all, as to competency, and second of all that the jury can rely on the CART interview. As I recall towards the end of that interview, the interviewer asked J.M., 'Am I wrong that you said that you were touched on your foof and on your bottom?' [¶] And J.M. responded and said, 'You are wrong. It was only my foof,' I'm paraphrasing, *but not my butt*. And I thought that was very enlightening and proof that this four-year-old- would not be led, number one, by the interviewer saying, 'Yeah, you're right it was both.' [¶] Number two, she said, 'No, you are wrong. I was just saying it was my foof.' So I think she's competent enough and I think it's sufficient to be affirmed on appeal if the jury wants to believe that." (Italics added.)

Turning to Lopez's argument, we first question whether Evidence Code section 1360 applies because J.M.'s statements would have been admissible under another exception to the hearsay rule. J.M. testified at trial that she had never been molested. However, in her prior statements she stated she had been molested by Lopez. Accordingly, these statements became admissible pursuant to Evidence Code section 1235 as prior inconsistent statements.

Even if we were to apply Evidence Code section 1360, the record provides sufficient evidence that the prior statements were sufficiently reliable to permit their admission at trial. Lopez bases his argument on the factors identified in *In re Cindy L.* (1997) 17 Cal.4th 15 and *In re Lucero L.* (2000) 22 Cal.4th 1227. These factors are (1) spontaneity and consistent repetition, (2) mental state of the declarant, (3) use of terminology unexpected of a child of similar age, (4) lack of motive to fabricate, and (5) whether the child understands the difference between the truth and a falsehood. Both cases also recognized that these factors constitute a "nonexhaustive list of factors." (*Cindy L.*, at pp. 28-29; *Lucero L.*, at p. 1239.)

We now turn to the statements made by J.M., which we summarized above. J.M. first brought up the molestation with her mother, M.R. M.R. explained that she was talking with J.M. and explained good and bad touches. M.R. told J.M. that no one should touch her "privates." At this point J.M. said that Lopez had touched her foof when they were sitting at the computer playing a game. M.R. asked if this was inside or outside of

21.

her shorts, and J.M. said it was inside of her shorts.  As a result, M.R. reported the matter to the police.

J.M. was first interviewed by police officers.  The interview was recorded and played for the jury.  In this interview, the officer confirmed J.M. knew the difference between the truth and a lie, and that J.M. knew she should not be touched on certain parts of her body.  J.M. initially denied that Lopez had done anything, and denied that anyone had touched her in inappropriate places.  J.M. also denied being afraid of Lopez.  However, when the officer asked her if anyone had touched her on her "foof," J.M. admitted Lopez had done so on one occasion and explained that it happened when she was playing games on Lopez's computer.

J.M. also was interviewed by the CART team.  The interview began by the interviewer asking questions that established J.M. was aware of her surroundings and her family life.  The interviewer also confirmed that J.M. knew the difference between good and bad touches.  The interviewer next asked if anyone had touched J.M. where they were not supposed to touch her, to which J.M. responded in the affirmative.  The interviewer then asked if anyone had touched J.M. on various parts of her body, eventually asking if anyone had touched J.M. on her vagina.  J.M. initially denied anyone had done so.  Shortly thereafter, J.M. admitted Lopez had touched her vagina one time.  J.M. explained she was playing a game on the computer and Lopez touched her when she needed help with the game.  J.M. asked Lopez to stop, and Lopez eventually removed his hand.  Near the end of the interview, the interviewer tested J.M.'s story as observed by the trial court in the above quote.  The interviewer also confirmed that J.M. knew the difference between the truth and a lie.

Lopez applies the above listed factors and concludes these statements were not sufficiently reliable to have been admitted at trial.  We disagree.  J.M., while reluctant to discuss the issue, consistently stated in these interviews that Lopez had touched her on one occasion on her vagina.  On each occasion J.M. confirmed the act occurred while she

was playing games on the computer at Lopez's house, and that no one else was present in the room at the time. It is true that J.M. was not entirely consistent. For example, she told the police officer that Lopez touched her on her underwear, while she told the CART interviewer that Lopez touched her underneath her underwear. Nonetheless, the differences were not significant enough to undermine confidence in the reliability of the statements.

Lopez asserts the statements were not spontaneous. He points out that J.M.'s reluctance resulted in the incriminating statements being made in response to direct questions, as opposed to a voluntary description of the events that took place. While we agree that J.M. did not at any time begin a conversation by stating she had been touched inappropriately, we think this fact did not render the statements unreliable. J.M. was only four years old when the molestation occurred and the statements were given. The act of molestation consisted of a touching of her vagina and did not include vaginal penetration. Lopez did not expose himself to J.M. These circumstances help explain J.M.'s reluctance because she may not have fully understood the significance of Lopez's actions. Moreover, J.M.'s consistent repetition of the event suggests the statements were reliable.

Lopez also asserts that J.M.'s statements were not made at or near the time of the molestation. His argument actually appears to be that the actual date on which the molestation occurred was unclear based on J.M.'s statements. While this is true, the lack of certainty as to the date is not remarkable considering J.M. was four years old.

Even if we were to consider the lack of spontaneity as suggesting the hearsay statements were not reliable, the remaining factors would not support such a finding. There is nothing in either interview that would suggest J.M.'s mental state was anything other than appropriate for a four-year-old child. Nor was her use of terminology unexpected for a four-year-old child. However, this is not surprising, considering she was touched only one time by Lopez. This is not a situation where there was repeated and varied acts of sexual abuse of a child. Nor was there any evidence that J.M. had a

23.

motive to fabricate her testimony. Lopez introduced evidence that he had refused to loan money to J.M.'s mother, apparently suggesting this was a motive for J.M. to fabricate the charges. However, there was no evidence J.M. had any knowledge of this proposed transaction, thus preventing an inference that J.M. fabricated the story to gain revenge for the slight.

Lopez places great reliance on the final factor—whether J.M. knew the difference between the truth and a lie. In both recorded interviews J.M. established that she knew the difference between the two. Lopez complains that no one asked J.M. if she was being truthful when she accused Lopez of touching her vagina. However, the record provides evidence that J.M. was telling the truth. As the trial court noted, there was strong evidence that J.M. was being truthful because she immediately corrected the CART interviewer about which parts of her body had been touched by Lopez.

Lopez also vigorously argues that J.M. lied when she testified, thereby establishing that she could have lied when she was interviewed. The lies told by J.M., according to Lopez, were that she did not recognize him when she testified, she did not recall speaking to the police, and she did not recall her aunts. Unlike Lopez, we do not find J.M. lied when she testified at trial. J.M. was only five years old when she testified, and she had not seen Lopez since he had molested her over one year previously. Moreover there was no evidence about whether Lopez changed his appearance. Considering her age, the lack of motivation to lie when responding to this innocuous question, and the uncomfortable situation in which J.M. found herself, it is possible that she simply did not recognize Lopez rather than choosing to respond falsely to a question that was not incriminating. The other "lies" identified by Lopez were not probative of any fact that would support Lopez's defense. Thus, J.M. did not have any motive to lie. Instead, we conclude that this five-year-old child was doing her best to answer questions in a very stressful and uncomfortable setting. To suggest J.M. intentionally lied is a distortion of the record.

24.

Taking into consideration all of the relevant factors, including J.M.'s age, the consistency of her statements, and her immediate recognition of the CART interviewer's misleading question, we conclude there was ample evidence in the record to support a finding that the time, content, and circumstances of J.M.'s statements provided sufficient indicia of reliability.

Because there were sufficient indicia of reliability to permit introduction of the statements pursuant to Evidence Code section 1360, and because the statements also were admissible pursuant to Evidence Code section 1235, Lopez cannot establish defense counsel was ineffective as a result of his failure to object to the statements pursuant to Evidence Code section 1360. Failure to object is based on a rational tactical basis if defense counsel reasonably assumes the objection would have been overruled. (*People v. Jones* (1998) 17 Cal.4th 279, 309 [counsel not ineffective for failing to make a meritless objection]; *People v. Samayoa* (1997) 15 Cal.4th 795, 848.) Accordingly, we reject Lopez's claim of ineffective assistance of counsel.

## II.     Excluded Testimony

M.R. obtained daycare for J.M. at the local YMCA for a period of time after she was molested by Lopez. During trial defense counsel informed the trial court he intended to call a teacher from the YMCA who would testify that J.M. frequently put her hands down her pants, touching her vagina. The trial court expressed doubt as to whether this evidence would support Lopez's defense—"The clear implication is that she's been molested so she does that sort of thing"—but did not prohibit defense counsel from inquiring into the topic. Defense counsel did not bring up the subject again until he filed Lopez's motion for a new trial. Defense counsel represented to the trial court that representatives from the YMCA would testify that J.M. had a habit of putting her hand down her pants during her nap. There also were two incidents where J.M. inappropriately touched another child's buttocks at the YMCA.

Lopez now contends defense counsel was ineffective for failing to move before trial to introduce this evidence and ensuring the trial court made a ruling on the admissibility of this evidence.

As explained above, a successful ineffective assistance of counsel claim requires the defendant to prove that defense counsel's performance fell below an objective standard of reasonableness, and that the defendant suffered prejudice as a result thereby. Lopez cannot meet either prong of this analysis.

Since the record does not reveal the reason for defense counsel's failure to seek to introduce this evidence, we cannot find he was ineffective, unless there could not be any satisfactory explanation for failing to do so. (*People v. Cudjo* (1993) 6 Cal.4th 585, 623.) A rational explanation for not introducing this evidence is readily apparent. These incidents occurred after Lopez allegedly molested J.M. A very reasonable inference could be drawn that J.M. was acting out *because she was molested*. Defense counsel could have decided to not introduce this evidence to avoid this inference, a decision well within "an objective standard of reasonableness under prevailing professional norms" (*Dennis*, *supra*, 17 Cal.4th at p. 540), especially since J.M. testified at trial that she had not been molested.

Nor can Lopez establish any prejudice as a result of the failure of defense counsel to introduce this evidence. Lopez asserts the jury would have inferred that J.M. acted out because she was molested by someone other than Lopez because these acts occurred four to five months after Lopez allegedly molested J.M. According to Lopez, this evidence would have established J.M. was mistaken when she identified him as the one who molested her.

Lopez's argument defies logic. The statements made by J.M. accusing Lopez of molesting her were given *before she began acting out*. Nor was there any evidence that someone other than Lopez had molested J.M. Therefore, these incidents of acting out, while perhaps suggesting J.M. had been molested, did not suggest someone other than

26.

Lopez had done so. For Lopez's theory to make sense, J.M. would have had to invent the accusations against Lopez before she was molested, and then have been molested by some unknown third person after she accused Lopez of molesting her.

We conclude that if the jury had heard this evidence and had given it any weight at all, it is likely it would have inferred the reason J.M. acted out was because she had been molested. Since there was no evidence that anyone other than Lopez molested J.M., the jury would have likely inferred that Lopez was guilty. Since this evidence was more likely to cause the jury to find Lopez guilty rather than not guilty, he did not suffer any prejudice as a result of defense counsel's failure to introduce this evidence.

### III.    Abstract of Judgment

The abstract of judgment states that Lopez is "prohibited from visiting any child under 18 years of age." At the oral pronouncement of judgment, and in the minute order, the trial court prohibited Lopez "from visiting any child *victim* under 18 years of age, pursuant to Penal Code section 1202.05." (Italics added.) Lopez contends, and the Attorney General agrees, that the abstract of judgment must be corrected.

### DISPOSITION

The judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment that accurately reflects the trial court's oral pronouncement of judgment as set forth in part III. above and to forward copies of the amended abstract of judgment to all appropriate agencies.